## FOSTER WHEELER CORPORATION et al., Appellants,

v.

## WESTERN WOOD PRODUCTS COMPANY et al., Appellees.

No. 3551.

Court of Civil Appeals of Texas.

Waco.

Dec. 11, 1958.

Rehearing Denied April 9, 1959.

Vinson, Elkins, Weems & Searls, M. C. Chiles, F. Russell Kendall, Houston, for appellant.

Kennerly & Lesher, A. C. Lesher, Jr., Houston, for appellees Schurig and Seven Seas Merc. Transport Co.

Hill, Brown, Kronzer & Abraham, Sam S. Minter, Houston, for other appellees.

TIREY, Justice.

This action is for breach of a contract and resulting damages in the nature of future profits because of said breach. The record is voluminous and the cause is complicated and does not yield to a concise statement. The statement below is gleaned substantially from the statement of appellants.

Appellees, W. R. Flocks and M. C. Reeves, Jr., d/b/a Western Wood Products Company, sued Foster Wheeler Corporation, Seven Seas Mercantile Transport Company, Inc., Henry E. Schurig, and Lee Construction Corporation to recover future profits which they claimed they would have earned from their performance of a written contract had defendants not breached the contract. The contract contemplated the warehousing, boxing and preparation for shipment of a quantity of material to Bolivia in South America and is dated July 28, 1948. It is alleged that the breach occurred in October 1948. The appellees allege their profits would have been $200,000 and prayed for judgment, interest and costs. It is not disputed that Foster Wheeler paid appellees everything that they claimed for services performed prior to October 28, 1948, and took off of their hands at their price all materials that they had suited for the work undertaken by them under the contract.

The jury in its verdict answered all of the issues in favor of appellees and against appellants and fixed the amount of appellees' future profits at $200,000. Judgment was

entered on May 15, 1957, in favor of appellees against Foster Wheeler Corporation, A. D. Lee, d/b/a Lee Construction Company, Lee Construction Corporation, as a corporation, and Lee Construction Company for $200,000, with interest thereon after May 15, 1957, at 6%, together with costs of court.

On motion of Seven Seas Mercantile Transport Company, Inc., and H. E. Schurig, the trial court entered judgment in their favor against plaintiffs and the plaintiffs perfected an appeal to this part of the decree.

Foster Wheeler Corporation, A. D. Lee, d/b/a Lee Construction Company, Lee Construction Corporation, as a corporation, and Lee Construction Company have appealed and are the appellants before this court.

Prior to July 1, 1948, Foster Wheeler Corporation contracted with the Bolivian Government to furnish the material and labor and to erect in Bolivia two small oil refineries. The project was financed by the United States through the Export-Import Bank. It was necessary for this Company to acquire and assemble in the United States the materials and ship to a port in Chile and by rail to each of the refinery sites in Bolivia. There were thousands of different kinds of materials and items necessary for each undertaking. It was necessary for the materials to be acquired in the United States and to procure and send to Bolivia the skilled workmen to do the erection work, and since the work was beyond the territorial limits of the United States, the workmen required substantial increase in pay over and above the standard pay for such work in the United States. In order to supply the materials and economically do the work, Foster Wheeler Corporation desired to send to each plant site the materials in the order that same were needed. The two refineries were to be located in different sections of Bolivia. The process of buying, assembling, crating, shipping and delivering the material to each plant site required strict and careful segregation of materials and itemizing the materials in

each shipping container; warehousing; crating; waterproofing and preparing same for shipment. In order to prevent pilferage enroute and after arrival at the plant site and damage to the material it was necessary to pack in tightly closed boxes. There was no source in Bolivia or within any reasonable distance of the plant site from which any of the necessary materials, tools or equipment could be supplied. Small items and items of small value were just as necessary and important to the construction as large and valuable items; for instance, paper for proper records of the work and materials, office supplies, soap, provisions, work clothes, tooth brushes, watches, medicines, razors and blades, as well as all the hand tools of every description and intricate small and large mechanisms had to be sent from the United States. It was a serious problem for materials intended for one plant to be sent to the other plant.

In 1948 and at all times material to this suit there was a scarcity of all metals and metal goods in the United States as well as the other materials necessary for workmen's use and comfort at the plant site. There were Federal Government restrictions levied upon the manufacturers which prevented making up any more of any item than the actual requirements for the job and there were priority regulations strictly enforced against supply and production. If any item was lost it was next to impossible to have it replaced. These restrictions applied to all items of materials and tools required for this undertaking. The Federal Export Customs Authorities required strict and accurate records. The shipping companies, the Federal License Authorities required strict, accurate and itemized records of each item shipped out of the country. These regulations provided civil penalties for violation. The Governments of Chile and of Bolivia required the same accurate accounting for all materials entering those countries and provided severe penalties for violation.

Foster Wheeler contracted in writing with Seven Seas to do the freight forward-

ing, warehousing, storing, crating, packing and taking care of the materials, equipment and property tendered to it to be sent to Bolivia for the erection of the refineries. The contract was made early in the year 1948 but was reduced to writing and dated June 18, 1948. Seven Seas was a New York corporation and had its place of business there. Because of the port and shipping facilities at Houston, Foster Wheeler assembled a portion of the materials at Houston and Seven Seas engaged H. E. Schurig to do its forwarding, warehousing, crating, etc., of said materials tendered to it at Houston.

Schurig was a freight forwarder but was not a warehouseman or a crater. However, under instructions from Seven Seas and with the knowledge and consent of Foster Wheeler, he sought proposals for the warehousing, crating and handling of such materials as were tendered to Seven Seas by Foster Wheeler at Houston. Appellee Western Wood Products Company submitted a proposal for said work to Schurig and Seven Seas and was awarded the warehousing, crating, handling and shipping work. This contract was given to them by Seven Seas Mercantile Transport Company, Inc. Lee Construction Company submitted a proposal for the work but no award of any kind was made to this company. Miles Strickland sought the warehousing and crating work but his offer was rejected by Seven Seas. The contract between Seven Seas and appellees was reduced to writing and dated July 28, 1948 and accepted by them. The Foster Wheeler materials addressed and directed to Seven Seas, 710 North Drennan Street, Houston, Texas, began to arrive about July 3, 1948. The appellee's (Western Wood Products Company) place of business was 710 North Drennan Street and they received the materials for Seven Seas when tendered by the carriers.

Appellants contend that neither of the appellees had ever done any warehousing or crating or preparing for shipment overseas for commercial concerns shipments of freight to any extent before this time. Appellees occupied a part of a warehouse building at 710 North Drennan Street in Houston, Texas, and obtained an open storage lot of about three acres near the warehouse. The storage lot used in their work was not covered with any character of surfacing material but had a dirt floor and a number of large trees standing on it. The crating work was awarded to appellees at 50 cents per cubic foot of the space in each container manufactured by them and shipped to the refinery site. In order for Foster Wheeler to get full value for the cubic footage in each box shipped, it was necessary for the box to be filled and this filling required an experienced packer. The appellees had not had any experience in packing boxes full to capacity for overseas shipments.

Foster Wheeler kept an employee at appellees' warehouse, whose first duty was to check the receiving papers and obtain warehouse receipts from appellees for materials actually received and to verify shipments and the shipping papers. Foster Wheeler paid the suppliers for the materials actually received at said warehouse, and Foster Wheeler payments to suppliers for the materials actually received at said warehouse was supposed to be based upon appellees' bonded warehouse receipts and it required the receipts to reflect accurately the materials. Commencing in July and during July, August and September 1948, great quantities of materials aggregating $312,000 in value were shipped by Foster Wheeler to Seven Seas at 710 North Drennan Street, Houston, and received by appellees, and the same were released to them for crating and shipment. The instructions from Foster Wheeler to appellees were to crate and make ready for shipment the materials when received and were generally in writing. They were notified of the urgent need of the materials, from time to time, at the plant site in Bolivia. This urgency reached them through H. E. Schurig as well as directly from Foster Wheeler. Appellants contend that in September and October 1948 appellees were

greatly behind with their crating and shipping of materials.

Appellees received great quantities of reinforcing rod required for foundation work in July and early August 1948; also a great quantity of railroad rails required at the plant site for switching tracks for moving into the refinery railroad cars carrying the materials. The appellees received great quantities of steel straight pipe, fabricated pipe, steel plate, steel beams, pipe fittings, tools and equipment. Appellees received a great number of fabricated houses designed to be used by the construction personnel at the plant site. As said material was received by appellees they were requested and instructed to prepare same for immediate shipment. They declined to do this and allowed it to accumulate until there was no space left on their premises for orderly storage. Ships with which Foster Wheeler and Seven Seas arranged to transport the materials to Chile and to Bolivia made regular bi-monthly calls at the Port of Houston and could and would have carried to destination the materials had they been tendered to them. Appellees failed to prepare and ship any substantial quantity of said materials; they were either unable or unwilling to move it in any proportion comparable to the needs of Foster Wheeler and its construction crew at the plant site. Instead of preparing said materials for shipment as it arrived, it was allowed to accumulate both in the closed warehouse and upon their open storage yard in great quantities. Foster Wheeler became desperately in need of their materials at the plant site; it had assembled a great force of workmen at the plant site but had no work for them because the materials were not shipped. Foster Wheeler and Seven Seas constantly urged appellees to expedite the preparation for and shipment of said materials. Appellees failed to crate and ship any substantial portion of said materials as aforesaid.

On and prior to October 16, 1948, Foster Wheeler, realizing that appellees were unable or unwilling to crate and ship their materials as they had contracted to do, sought from and obtained a proposal and commitment from Lee Construction Company to warehouse, crate and ship such portion of their materials as was tendered by Foster Wheeler to it. Commencing shortly after October 16, 1948, since appellees' storage space was so crowded with materials and no prospect of moving it to Bolivia, and realizing that a very substantial quantity of materials was then enroute to Houston, diverted incoming materials to Lee Construction Company for crating and shipment to the plant site. Appellees, on or about October 28, 1948, discontinued their crating and refused to release any of the materials held on hand to Foster Wheeler for immediate shipment. These materials, approximately 252 truckloads, were finally released in late November 1948 to Lee Construction Company and were crated and shipped by this concern to Bolivia.

Foster Wheeler paid appellees for every cubic foot of material crated by them and for every service performed or claimed by them for warehousing, crating, waterproofing and shipping the materials prior to October 28, 1948. It bought from appellees and paid them their price for all materials which they had on hand that they or anyone else could use in connection with crating, preparing for shipment, waterproofing and shipping said materials. The foregoing settlement was made without prejudice to appellants or appellees for the alleged breach of the contract.

Appellees in their pleading contended that under their contract they had the right to warehouse, crate, handle and ship all of the materials that Foster-Wheeler sent to Bolivia through the Port of Houston, and they further alleged that they would have made a profit on this work at the contract price of 50 cents per cubic foot and claimed that their contract called for a minimum of 2,-000,000 cubic feet to be shipped.

Appellees in effect say that the foregoing statements are inaccurate but it would not serve any useful purpose to set out their contentions here except to say that they

claim that they complied with the contract and that appellants wrongfully breached it.

■ At the conclusion of the evidence the court overruled appellants' motion for an instructed verdict and submitted the cause to the jury on 22 special issues. Absent the burden of proof clause, they are substantially to the effect: Do you find (1) that at no time before October 28, 1948, did Seven Seas Mercantile Transport Company, Inc., or Foster Wheeler Corporation, or any of their agents or representatives, request Western Wood Products Company, in writing, to provide additional facilities, or stating that the warehousing and packaging was unacceptable to them through faulty workmanship or negligence or disregard of their representative's instructions?, to which the jury answered "We do"; (2) that on or prior to July 28, 1948, Seven Seas Mercantile Transport Company, Inc., agreed with Western Wood Products Company that the latter company would do all of the crating of materials, other than materials crated by suppliers, that were to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (3) that on or prior to July 28, 1948, Seven Seas Mercantile Transport Company, Inc., agreed with Western Wood Products Company that there would be a minimum amount of two million cubic feet of crating of material to be performed by Western Wood Products Company to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (3a) that the instrument of July 28, 1948, considered by itself and without regard to the letters of June 15 and 17, 1948, and various conversations between Western Wood Products Company and Seven Seas Mercantile Transport Company, Inc., prior to July 28, 1948, was not intended to be the sole agreement between Western Wood Products Company and Seven Seas Mercantile Transport Company, Inc.?, to which the jury answered "It

was not intended as the sole agreement"; (4) that at the time the instrument of July 28, 1948, was forwarded to Western Wood Products Company, Seven Seas Mercantile Transport Company, Inc., and Western Wood Products Company intended that the latter company would do all of the crating of materials other than materials crated by suppliers that were to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (5) that at the time of and in connection with the negotiations with Western Wood Products Company and through October 28, 1948, Seven Seas Mercantile Transport Company, Inc., was acting as an agent for Foster Wheeler Corporation relative to the warehousing and crating of materials, other than materials crated by suppliers, that were to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (6) that after Western Wood Products Company undertook to start crating a portion of the materials to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries, and prior to October 28, 1948, A. D. Lee and O. S. Justus conspired to interfere with Western Wood Products Company's crating of materials to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (7) that A. D. Lee and O. S. Justus, after so conspiring, if you have so found, entered upon a course of conduct for the purpose of interfering with Western Wood Products Company's crating of materials to be forwarded from the Port of Houston in connection with the Foster Wheeler contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (8) that in so conspiring with O. S. Justus, if you have so found, A. D. Lee was undertaking to secure the benefits, if any, of Western Wood Prod-

ucts Company's contract rights with Seven Seas Mercantile Transport Company, Inc., or Foster Wheeler Corporation for the benefit of Lee Construction Company?, to which the jury answered "We do"; (9) that Western Wood Products Company, under all the circumstances which existed on or prior to October 28, 1948, was proceeding with due diligence to perform its undertaking to crate materials to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (9a) that Western Wood Products Company, under all the circumstances which existed on and prior to October 28, 1948, was substantially performing its undertaking to crate materials to be forwarded from the Port of Houston in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "We do"; (10) what do you find to be the reasonable cash value of the loss of profits, if any, that Western Wood Products Company would have in reasonable probability made from October 28, 1948, until the completion of its undertaking to crate the materials to be forwarded from the Port of Houston after such date in connection with the Foster Wheeler Corporation contract to construct the two Bolivian refineries?, to which the jury answered "$200,000.00"; (11) that plaintiffs failed to keep all of Foster Wheeler materials or equipment stored by them in their open space protected from direct contact with the ground?, to which the jury answered "They did not fail"; (12) that the plaintiffs failed to unload all Foster Wheeler materials and equipment tendered to them from the delivering carrier with diligence?, to which the jury answered "They did not fail"; (13) that plaintiffs failed to follow Foster Wheeler's instructions to box or package said company's materials and equipment promptly and with diligence after same were received by plaintiffs?, to which the jury answered "They did not fail"; (14) that plaintiffs failed to ware-house and protect Foster Wheeler materials or equipment stored on their open space from damage?, to which the jury answered "They did not fail"; (15) that plaintiffs' manner of storing Foster Wheeler Corporation's materials or equipment was faulty?, to which the jury answered "We do not"; (16) that plaintiffs' workmanship in boxing or crating Foster Wheeler's materials or equipment was faulty?, to which the jury answered "It was not"; (17) that plaintiffs' manner of receiving Foster Wheeler's materials or equipment was faulty?, to which the jury answered "We do not"; (18) that at any time during July, August, September and October, 1948, the facilities provided by plaintiffs for warehousing and packaging of Foster Wheeler materials and equipment was unacceptable to Foster Wheeler Corporation?, to which the jury answered "It was not"; (19) that the plaintiffs failed to box, crate or package during August, September or October, 1948, after being requested by Foster Wheeler to do so, a reasonable quantity (in proportion to the quantity of material received by them), of Foster Wheeler materials in their possession as requested by Foster Wheeler Corporation?, to which the jury answered "They did not fail"; (20) that plaintiffs failed to keep detailed accounts with respect to all costs and disbursements applicable to the warehousing and boxing of Foster Wheeler materials?, to which the jury answered "They did not fail"; (21) that plaintiffs failed to pay all hourly employees not less than 1½ times their respective regular wage rates for all overtime worked on Foster Wheeler warehousing, boxing and crating?, to which the jury answered "They did not"; (22) that Foster Wheeler Corporation, in directing Seven Seas Mercantile Co., Inc., to provide other facilities than those of the plaintiffs to warehouse, crate and box its materials and equipment acted in good faith?, to which the jury answered "They did not."

Thereafter the court overruled defendants' motion for judgment notwithstanding the verdict and entered judgment on appel-

lees' motion for $200,000, plus legal interest and costs. Defendants seasonably filed their amended motion for new trial and it being overruled perfected their appeal. The cause is here on transfer.

The judgment is assailed on what appellants designate as 37 points. Appellants have grouped Points 1–9 under one argument and we will likewise consider them together. They are substantially to the effect that the court erred (1) in refusing at the conclusion of all the evidence to instruct the jury to return a verdict for appellants and in refusing their amended motion for new trial. Appellees' suit is for future profits under a contract wholly written, full and complete, covering all matters agreed upon between the parties to it and free from fraud and mistake in its procurement. Since appellees failed and refused to perform said contract with diligence and as directed on and prior to October 28, 1948, and since appellees had no exclusive right to crate any specific quantity of Foster Wheeler materials, said written contract could not be changed or have terms added to it without appellants' consent, providing appellees a specific quantity of material for crating, and since appellees had been paid in full for every service performed prior to said date, appellants had the right without liability to appellees to take, crate and handle its materials by and through facilities other than appellees; (2) in refusing appellants' motion for judgment notwithstanding the verdict of the jury, or in the alternative in refusing appellants a new trial. Appellees' suit is for future profits under a contract wholly written, full and complete, covering all matters agreed upon between the parties to it and free from fraud and mistake in its procurement. Since appellees failed and refused to perform said contract with diligence and as directed on and prior to October 28, 1948, and since appellees had no exclusive right to crate any specific quantity of Foster Wheeler materials, said written contract could not be changed or have terms added to it without appellants' consent, providing appellees a specific quantity of material for crating,

and since appellees had been paid in full for every service performed prior to said date, appellants had the right without liability to appellees to take, crate and handle its materials by and through facilities other than appellees; (3) in submitting Issue No. 2 to the jury and in refusing appellants' amended motion for new trial. The contract between appellees and Seven Seas is in writing, full and complete, and covers all matters agreed upon between the parties to it and it made no provision for the matters inquired about and under the law said contract cannot be changed or have said provisions added to it by parol without the consent of Seven Seas and Foster Wheeler; (4) in submitting Issue No. 3a to the jury and in refusing appellants' amended motion for new trial. The contract between appellees and Seven Seas is in writing, full and complete, and covers all matters agreed upon between the parties to it and it made no provision for the matters inquired about in said issue and under the law said contract cannot be changed or have provisions added to it by parol without the consent of Seven Seas and Foster Wheeler. The intention of the parties was a conclusion of law which must have been determined by the trial court from the language of the instrument; (5) in submitting to the jury Issue No. 4 and in refusing appellants' amended motion for new trial. The contract between appellees and Seven Seas is in writing, full and complete, and covers all matters agreed upon between the parties to it and it made no provision for the matters inquired about in said issue and under the law said contract cannot be changed or have provisions added to it by parol without the consent of Seven Seas and Foster Wheeler. The intention of the parties was a conclusion of law which must have been determined by the trial court from the language of the instrument; (6) in submitting Issue No. 5 as a basis for inferring and assuming from an affirmative answer thereto that H. E. Schurig, as representative of said Seven Seas Company, made and had authority to make an oral agreement with appellees, contrary to the

written contract of July 28, 1948, binding Foster Wheeler to allow appellees to warehouse and crate all of its materials—a minimum of 2,000,000 cubic feet—shipped from the Port of Houston. The contract between appellees and Seven Seas is in writing, full and complete, and covers all matters agreed upon between the parties and under the law it cannot be changed by parol without the consent of Seven Seas and Foster Wheeler, and appellants' amended motion for new trial should have been granted; (7) in allowing appellees, W. R. Flocks and H. E. Schurig, to testify, giving as their respective conclusions in effect that Seven Seas was the agent of Foster Wheeler Corporation and thereby inferring that H. E. Schurig made and had authority to make a parol contract with appellees, binding Foster Wheeler Corporation, contrary to the written contract of July 28, 1948, to allow appellees to warehouse and crate all of its materials—a minimum of 2,000,000 cubic feet—shipped from the Port of Houston; and (8) in refusing appellants a new trial because there was no legally competent evidence, at least the evidence was insufficient and incompetent, to support the verdict of the jury in answer to Special Issues Nos. 2, 3, 3a, 4 and 5 and the judgment of the court thereon.

Appellees in reply to the foregoing points say in part:

"On and before the early part of June 1948, the appellees operated a commercial woodworking and crating installation in Houston. *They were experienced in crating heavy items for export. On June 14, 1948, Mr. Henry E. Schurig approached appellees about the job of crating for export certain refineries for Foster Wheeler. Mr. Schurig asked that appellees bid on this contract.* At the same time Lee Construction Company, one of the appellants, was requested to, and did, submit a bid. A third export crater, Miles Strickland, not a party to this suit, was also requested to submit a bid for this contract, which he did. Following the submission of these bids Mr. Schurig and Mr. Frank Cole, the purchasing agent for Foster Wheeler, inspected the facilities of the three companies that had submitted bids. The appellees' bid was the lowest of the three, and Mr. Schurig notified them on the 16th or 17th or 18th of June that they were to have the contract.

"Prior to the submission of the bid on the contract by appellees, Mr. Schurig advised them that there would be 2,400,000 cubic feet of crating to perform, which was confirmed by Mr. Barrow, the manager of the Foster Wheeler Houston office. It was represented by both Mr. Schurig and Mr. Barrow to the appellees that all Foster Wheeler materials shipped to Bolivia through the Port of Houston, other than materials crated by supplier, would be crated by the appellees. This evidence was corroborated by the testimony of A. D. Lee, one of the appellants, who testified that his company was advised, preparatory to making his bid, that there would be a 'tremendous shipment' and that, in determining the per unit bid, the entire job was considered.

"Mr. Barrow, Mr. Cole and Mr. Schurig told appellees that they would receive a 'purchaser order,' but not to wait for it, and go to work on the contract. Thereupon the appellees, on and immediately following June 18, 1948, began the remodeling of their office space to accommodate the Foster Wheeler employees. Appellees also at that time started hiring additional personnel to handle the Foster Wheeler contract, leased the necessary outside storage space, purchased additional equipment, and began preparing their facilities for the receipt of the Foster Wheeler material. The first Foster Wheeler materials arrived and were warehoused at the appellees' plant on July 3, 1948.

"On June 18, 1948, subsequent to Foster Wheeler's award of the contract to appellees, the appellant Lee Construction Company submitted a revised bid five cents per cubic foot lower than the appellees' bid. Mr. Barrow, Foster Wheeler's manager, testified that this bid was never presented to him personally, but he understood that such bid had been made, but that it didn't make any dif-

ference because he considered the contract to have been already entered into with appellees.

"On July 28, 1948, Foster Wheeler, through its agent Seven Seas Mercantile Transport Company, sent the appellees, through the mail, a letter, which is plaintiff's exhibit No. 3, which the appellants assert is the sole contract between Foster Wheeler and appellees. This letter on its face pertains to nothing except the details of the manner of handling the contract and the consideration to be paid therefor, and does not purport to deal with any of the broader aspects of the contract; and further on its face refers to the other oral and written portions of the contract. The first paragraph of this instrument of July 28, 1948, reads as follows:

" 'With reference to our various conversations and your letters of June 15 and 17, we wish to give you herewith confirmation of the warehousing agreement as set forth by the Foster Wheeler Corporation on June 18 and Change Order No. 1 under date of July 2.'

"This letter further provides under the heading 'Intent and General' as follows:

" '(A) The intent of this purchase order shall be understood by agent (appellees) to form the basis for a working agreement by and between the agent and contractor (Foster Wheeler) under which enumerated terms and conditions the agent agrees to perform all services requested with diligence and to the best of his ability.' * * *

"From July 3, 1948, until October 28, 1948, the date on which Foster Wheeler terminated its contract with appellees, it is undisputed in the record that the appellees handled, warehoused and crated all Foster Wheeler materials shipped to Bolivia from Houston except that crated by suppliers. The appellants Foster Wheeler, Seven Seas, and Lee were not able to put in the record one instance of an exception to the exclusive handling of this contract by appellees prior to the termination date of October 28, 1948.

"In connection with the appellants' assertion in their Statement under the Points here replied to, that appellees seek to add the two million cubic feet figure as the extent of the contract by parol, in addition to the fact that the appellee Flocks testified that this figure had been represented to him by Schurig, Barrow and Cole; and the appellee Reeves, that such representations were also made to him by these individuals, had it been the fact that a lesser amount than this had been shipped by Foster Wheeler through the Port of Houston which crating was necessary, the appellants had every opportunity to prove this fact. Mr. Schurig testified that Seven Seas' records were sent to New York. Mr. Schurig further testified that his own records were destroyed after five years. Foster Wheeler, speaking through Mr. Barrow, made it clear that even though they had known since May of 1956, when Barrow's deposition was taken, that the appellees wished to establish by Foster Wheeler records the actual amount of material that was crated in Houston, the Foster Wheeler Corporation produced no records and made no computation of the exact amount of cubic footage that went through the Port of Houston. * * *

"Mr. Barrow further testified that in selecting the appellees' facility for the necessary crating work he personally inspected the appellees' plant, had Foster Wheeler's purchasing agent inspect it, and they, the Foster Wheeler employees, in effect selected the facilities of appellees. Mr. Barrow in his testimony makes it clear that he was the one who decided to award the contract to appellees. Mr. Schurig testified as follows: 'My practice was to rewrite the letters verbatim that may have been received by me from Foster Wheeler to Western Wood and vice versa.' Mr. Schurig testified that he assumed he had the authority to contract with Western Wood on Foster Wheeler's behalf and that Mr. Barrow, Foster Wheeler's Houston representative, never told him that he didn't have such authority as Foster Wheeler's agent.

"As appellees understand Foster Wheeler's contention under these first Nine Points of Error, Foster Wheeler (and, incidentally, Seven Seas Mercantile Transport Company, Inc.) had an absolute right to terminate or divert the work of Western Wood regardless of the fact that the latter may have been fully performing everything required of it by Foster Wheeler and/or Seven Seas. It is said that the unsigned (by Western Wood) 'purchase order' or 'letter' of July 28, 1948, is a completely unambiguous document delineating the rights of the parties, which, by application of the 'Parol Evidence Rule,' merged all prior written or oral agreements concerning the subject matter of crating and exporting the materials for shipment to Bolivia.

"Numerous authorities have been cited to the court in Foster Wheeler's tortuous attempt to apply the 'Parol Evidence Rule' to this fact situation. We sincerely and earnestly submit that this appellants' authorities are either mis-cited, reversed by subsequent opinions of higher courts, involve completely inopposite rules of law, or are no more than mere general pronouncements of law. In this connection, appellees suggest to the court that a slight analysis of appellants' authorities will demonstrate that the action of the trial court in determining that the Parol Evidence Rule was inapplicable to the oral agreements found by the jury to exist was completely accurate.

"To begin with, we have no quarrel with the Harper, Belcher, Milliken and Risley cases, cited and discussed on Pages 48 through 51 of appellants' brief, as they merely announce and apply the general rule, that if the writing expressly covers the matter sought to be proved, and is contrary to a parol understanding, the express written provisions control in the absence of allegations and proof of fraud, accident or mistake. Nor do we quarrel with the principle announced in such cases as Patton v. Cruse [Patton v. Crews, Tex. Civ.App., 264 S.W.2d 467], cited on Page 56 of appellants' brief, that parol testimony is not admissible to establish an 'ambiguity' if the written instrument is otherwise complete and unambiguous on its face. We do quarrel, however, with Foster Wheeler's attempts to forcibly fit this fact situation into those cases.

"There is, as this Honorable Court knows, an equally well settled Rule of Common Law, to the effect that 'a prior or contemporaneous parol agreement consistent with and forming a part of the contract, is to be construed with the written part thereof.' See Rule 21, Art. 3713, V.A. T.[Civil]S., now Rule 184, T.R.C.P. Our courts have expressly held that these Common Law Rules of evidence have, by Statutory Enactment, been made part of the Law of Texas. Hultquist v. Ring, 301 S.W.2d 303, 307 (Tex.Civ.App. Galveston 1957, wr. ref. N.R.E.); Hunter Milling Company v. Satterwhite, 60 S.W.2d 316, 319 (Tex.Civ. App. Galveston 1933, No Writ History). The Satterwhite case is particularly appropriate to this discussion for not only does it enforce a contemporaneous oral agreement, but the court expressly held that an 'agent' similarly situated to Seven Seas and Schurig in this case, did not exceed his authority in making certain representations and warranties concerning the quality of the flour contracted for.

"The courts, in giving effect to prior or contemporaneous oral agreements, not inconsistent with the written portion of the 'contract,' have variously styled and denominated this ancillary doctrine to the 'Parol Evidence Rule.'" (Italics ours.)

Appellees went to trial on their first amended original petition. This pleading consists of approximately 20 pages of legal cap paper. It alleges specifically that Seven Seas and Schurig were each the duly authorized agents of Foster Wheeler Corporation in the matters pleaded and in their duties with Foster Wheeler Corporation with full knowledge of Foster Wheeler Corporation in doing the acts and things that were done by each agent. They further alleged that they were advised by Schurig, before submitting a bid on this

project, that it would require Foster Wheeler from 18 to 24 months to complete the construction of the projects in Bolivia and that he estimated approximately $3,000,000 upon the ocean freight charges from the Port of Houston alone and that this estimate did not include any costs of crating, packing, warehousing, processing, delivery to shipside and other services that plaintiff would perform if they were selected to do the work; that Schurig was also the agent and representative of Foster Wheeler and Seven Seas and that he agreed with plaintiffs that the foregoing matter should be taken into consideration by plaintiffs in making their bid, and that these would constitute a part of said bid on the contract; that near the conclusion of their conferences with Schurig that the plaintiffs wrote Schurig two letters, one dated June 15, 1948, and that it began as follows: "Relative to the matter of receiving, handling and packing the oil refinery equipment for the Foster Wheeler Company which is to move for export through the Port of Houston, etc." The other letter was dated June 17, 1948, and began as follows: "Supplementing our letter of June 15, regarding Foster Wheeler export, contract, etc. Plaintiffs allege that these originals were in the hands of Foster Wheeler or its agent Seven Seas Mercantile Transport Company or H. E. Schurig, and plaintiffs made demand upon defendants to produce the original of said letters on the trial of this cause, otherwise secondary evidence of their contents would be offered; that thereafter plaintiffs received a letter dated July 28, 1948, addressed to them and signed by Seven Seas Mercantile Transport Company by H. E. Schurig, which set forth in part the agreement and contract between them and defendants. In this letter Seven Seas and Schurig were acting as the duly authorized agent of Foster Wheeler and as individuals. They specifically allege: *"That the matters and things discussed and agreed upon by plaintiffs and H. E. Schurig hereinbefore pleaded and the two letters written by plaintiffs dated June 15,* *1948 and June 17, 1948, addressed to H. E. Schurig and Company hereinbefore referred to and the letter of date July 28, 1948, addressed to Western Wood Products Company hereinbefore referred to constituted the contract between plaintiffs and Foster Wheeler Corporation and Seven Seas Mercantile Transport Co., Inc., and H. E. Schurig as agents for Foster Wheeler Corporation and individually.* These plaintiffs further allege that shortly after June 17, 1948, they were notified and informed by defendant Schurig and M. H. Barrow, the local representative of Foster Wheeler Corporation in charge of such corporation's business and affairs in Harris County, Texas. * * * The said Barrow and Schurig at said time advised these plaintiffs that a letter would be within a few days thereafter written to plaintiffs outlining some of the details of the operations under such contract and the prices Foster Wheeler Corporation would pay to plaintiffs for performing said services under plaintiffs' contract with Foster Wheeler Corporation. These plaintiffs say that in conformity with said instructions from the said Schurig and Barrow they promptly began converting and enlarging their plant and supplementing their force by employing additional persons qualified to perform the services contemplated by their contract with Foster Wheeler Corporation. Plaintiffs further allege that they did on or about July 28, 1948, receive the letter hereinbefore referred to which was signed by Foster Wheeler Corporation's agent and representative, Seven Seas Mercantile Transport Co., Inc., by Henry E. Schurig. Plaintiffs further say that promptly upon being notified that the contract had been awarded to them by Foster Wheeler Corporation they discontinued manufacturing and selling all products which plaintiffs had theretofore been manufacturing and selling and restricted their advertising program so as to be able to prevent as much as possible any conflict with other business being handled by and through their plant while reorganizing for the large scale op-

erations contemplated by the Foster Wheeler Corporation's contract with plaintiffs." (Italics ours.)

We find no allegation in the pleading to the effect that there was any fraud or mistake in the letter of July 28th. We quote in full the letter of July 28th.

"Gentlemen:

"With reference to our various conversations and your letters of June 15th and 17th, we wish to give you herewith confirmation of the warehousing agreement as set forth by the Foster-Wheeler Corporation on June 18th and change Order No. I under date of July 2nd:

"II.   Warehousing Agent

"(A) The Agent agrees to furnish the contractor, in or near the City of Houston, Texas, adequate space for storage of all consignments or shipments, either closed or open, as requested by contractor. Closed space is understood to be inside under cover, totally enclosed space. The estimated requirements for closed space will be in the order of 10,000 (ten thousand) square feet, except that Contractor does not guarantee this figure to be a maximum. Open space is understood to be outside unprotected storage space, except that all such open storage areas shall be enclosed by steel mesh industrial fencing. The requirements for open space are estimated to be not more than three (3) acres. The agent shall be permitted to store crated or boxed or packaged equipment in open space, when such permission is received from Contractor's representative and where such item is adequately protected from weather by means of weatherproofed coverings. All materials or equipment stored in open space shall be protected from direct contact with ground. The exact type of racks, flooring, sills, or other method of elevating equipment is to be determined by and between agent and Contractor's representative. The agent further agrees to furnish private office space, together with necessary fixtures, including local (Houston) telephone service for use of

Contractor's personnel, consisting of not more than two (2) persons. Agent shall provide all necessary facilities for personnel comfort as requested by Contractor.

"(B) The Agent shall be paid for storage space on the basis of received-in-warehouse weight as follows:

"1.   For inside space, $0.0775 per 100 pounds per month;

"2.   For outside space, $0.060 per 100 pounds per month; except see Free Storage Time under II, (F), 1., below.

"(C) Crating of materials and/or equipment or consolidation or boxing or skidding shall be predetermined by and between Contractor's representative and agent, and specifications for same shall be furnished agent by Contractor's representative.

"1.   Charges by Agent for strapping and crating or boxing shall be $0.50 per cubic foot, based upon finished cubic feet per package.

"2.   No lumber used shall be less than two (2) inches thick. All lumber used for crating or boxing shall be S4S pine. Timber skids of pine shall be provided where required, as decided upon by and between Contractor's representative and agent.

"(D) Charges for water or weather proofing for items, as requested by Contractor's representative, shall be included in the cubic foot charge under II, (C), 1, above.

"(E) No storage shall be charged on packaged (crated or boxed) items.

"(F) Handling Charges

"1   Unpackaged Items:

"In charge, $0.025 per 100 pounds, (2) two weeks' free storage to be allowed;

"Out charge, $0.025 per 100 pounds. The above is understood to provide two (2) weeks' free storage for all unpackaged items, with the in and out charge to be $0.05 per 100 pounds.

"2.   Packaged Items:

"No in and out charges shall be made for packaged items.

"3.   It is understood that packaged items shall be shipments of consignments

or equipment which are boxed or crated, or crated and strapped.

"Unpackaged items shall be equipment or materials which, due to size or shape, shall be unenclosed by agent.

"4. Extra Charges for Heavy Lift Items (Three (3) Tons or More).

"It is understood that the ton used herein is two thousand (2,000) pounds. It is further understood that each lift shall be considered separately whether in or out.

3 tons to 10 tons — $1.00 per ton
Total Tonnage.
10 tons to 20 tons — $2.00 per ton
Total Tonnage.
20 tons to 35 tons — $3.00 per ton
Total Tonnage.
35 tons to 50 tons — $5.00 per ton
Total Tonnage.
50 tons and over — To be predetermined by and between Contractor and Agent.

"5. Transportation of Materials to Dock.

"By truck—$0.125 per 100 pounds

"Railroad—Actual railroad freight charge.

"(H) All labor and/or material which shall be required in order to meet certain specifications or requests by Contractor not covered in the above classification shall be furnished by agent at the actual cost thereof, plus twelve (12) per cent.

"(J) The agent shall furnish the Contractor, without charge, bond receipts for warehousing facilities.

"(K) The Agent shall furnish the contractor insurance policy certification to cover equipment handled, the charges for such insurance to be included in above handling or packaging or warehousing charges.

"(L) Twenty four (24) hour protection through watchmen shall be provided at all times.

"(M) All agent's charges for services shall be invoiced monthly and shall be payable net upon invoicing.

"(N) The Contractor's standard purchase order attachment, consisting of nine (9) enumerated paragraphs, is included herewith and shall be considered to be a part of this purchase order, except where reference is made to 'Foster Wheeler Corporation,' this shall indicate Contractor, and where reference is made to 'Vendor,' this shall indicate Agent; and with the following additional exceptions noted below, as referenced to paragraph numbers included in attachment, omit Paragraph 1.0, Paragraph 2.0, Paragraph 7.0 in their entirety. Paragraph 4.0 shall be effective.

"Paragraph 5.0 It is understood that where the word 'inspector' occurs, this shall refer to Contractor's representative on Agent's premises. References as to 'Notification' are hereby waived as becoming a part of the Agent's operations directly with the Contractor's representative.

"Paragraph 9.0 shall be effective only under Item II, (H) above.

"III. Intent and General

"(A) The intent of this purchase order shall be understood by Agent to form the basis for a working agreement by and between the Agent and Contractor, under which enumerated terms and conditions the agent agrees to perform all services requested with diligence and to the best of his ability. The Agent shall not profit by errors or omissions on the part of the Contractor or the Contractor's representative or representatives, but shall bring to the Contractor's notice, by written statements, any such errors or omissions.

"(B) It is agreed by and between the Contractor and the Agent that if at any time the facilities provided by Agent for warehousing and packaging prove unacceptable to the Contractor through faulty workmanship or negligence, or disregard of the Contractor's representative's instructions, the Contractor may request the Agent in writing to provide, and the Agent shall so provide, other facilities, acceptable to the Contractor, at which time the terms and conditions herein under Part II may be subject to renegotiation.

"(C) The acknowledgment of this purchase order shall be understood by Agent to constitute the execution of this instrument as an agreement by and between the Agent and Contractor subject to the terms and conditions herein.

"General Notes

"1.0 All instructions pertaining to shipping, packing, marking, routing, shipping lists, shall be furnished at a later date.

"2.0 Four copies of all purchase orders issued by yourselves on materials required for fabrication of equipment herein shall be forwarded to point of origin of this purchase order. A bi-monthly report of status of such material shall also be furnished.

"3.0 Bi-monthly reports of status of materials, or engineering or shopwork on equipment ordered by yourselves in fulfillment of this order shall be forwarded to origin point of this purchase order.

"4.0 Foster Wheeler Corporation representatives shall have access to Vendor's or Vendors' manufacturers shops or warehouses for purpose of ascertaining status of work or materials at all times.

"5.0 Equipment manufactured shall be subject to Foster Wheeler Corporation inspection as to workmanship and materials. Materials or work rejected by Inspector shall be replaced or reworked accordingly, where equipment is fabricated in accordance with a code requirement, the judgment of the Foster Wheeler Corporation Inspector with respect to workmanship shall be considered final. Acceptance of equipment by Inspector shall not relieve the Vendor of his responsibility. Where shop inspection is specifically indicated in requisition, Vendor shall notify Foster Wheeler Corporation, General Production Department at least ten (10) days prior to date set for inspection. One copy of such notification shall be forwarded to point of origin of purchase order.

"6.0 Guarantee The Vendor guarantees all equipment furnished against operational or mechanical failure due to faulty design or workmanship for eighteen (18) months from date of delivery, or twelve (12) months from start of operation, saving purchaser harmless from all replacement costs exclusive of transportation.

"7.0 Patent Protection The Seller agrees to protect and save harmless the Purchaser and its customers from all costs, expenses or damages arising out of any infringement or claim of infringement of patents in the use or sale of articles or materials covered by this order.

"8.0 The Contractor agrees that it and all subcontractors and vendors will pay all employees engaged in work hereunder (whether at the site of the unit or elsewhere but excepting those employees specifically exempted in Section 13(A) of the Fair Labor Standards Act of 1938 [29 U.S.C.A. § 213(a)] and regulations issued thereunder) not less than the minimum wages fixed in said Fair Labor Standards Act and regulations issued thereunder, and that they will pay all such employees not so exempted for all overtime worked hereunder in the manner specified in said Fair Labor Standards Act and all applicable State Wage and Hour Act and at rates which are not less than $1\frac{1}{2}$ times the respective regular wage rates. But also are not less than those specified in any such State Wage and Hour Act. The Contractor further agrees that it and all subcontractors and vendors will conform to the provisions of any future amendments of said Fair Labor Standards Act and/or of any applicable State Wage and Hour Act, which may become operative prior to complete performance by the Contractor of all its obligations under this contract. The Contractor agrees that acceptance of the purchase order shall be considered as certification of compliance with the Fair Labor Standards Act of 1938 and/or the applicable State Wage and Hour Act as outlined above.

"9.0 The Vendor with whom this order is placed certifies that by acceptance thereof he agrees to:

"1. Keep accurate and suitably detailed accounts with respect to all costs and disbursements thereunder.

"2. Permit Foster Wheeler Corporation's auditors to have access at any and all reasonable times to the Vendor's books and other records pertaining to such account.

"3. Furnish said auditors such statements, invoices, receipts, vouchers, and other information as may be needed by them in auditing said accounts. (The above is applicable only to Vendors with whom a 'Cost Plus' agreement has been entered into.)

"Change In Order Dated 7/2/48, Change No. 1.

"To change that part of the original order, Section II, paragraph D now reading :–

" 'Charges for water or weatherproofing for items, as requested by Contractor's representative, shall be included in the cubic foot charge under II, (C), 1., above.'

"Change to read :

" 'No additional charges over the cubic foot charge shall be made for water or weatherproofing items packaged or boxed, as requested by contractor's representative.'

"Yours very truly,
"Seven Seas Mercantile Transport Co., Inc.
"By Henry E. Schurig
Houston Agency."

This letter is on the stationery of Seven Seas and it is signed by Mr. Schurig as shown in the quote.

The letter of Foster Wheeler dated June 18th was not tendered in evidence. It was attached to the pleading of appellants on which they went to trial and was read to the jury. The letter of July 28th was tendered in evidence by appellees as well as the letters of June 15th and 17th referred to in the letter of July 28th.

Appellee Flocks testified to the effect that he understood that appellees would receive a purchase order but Schurig and Seven Seas told him in effect to go to work and not to wait for the purchase order, and that Flocks was referred to the purchase order dated July 28, 1948, tendered in evidence by appellees. Going back

to appellees' letters of June 15th and 17th we find nothing in these letters to indicate or suggest to the appellants that appellees' bid was grounded on the understanding and on the representations that appellees would be allowed to crate a minimum of 2,000,000 cubic feet on the price they submitted. There is certainly nothing in the letter of Seven Seas of July 28th to appellees indicating or suggesting that Foster Wheeler was agreeing or had agreed that appellees would crate a minimum of 2,000,000 cubic feet of materials to be shipped to Bolivia. As we understand Flocks' testimony, he understood that their contract for the warehousing and crating work of the Foster Wheeler materials would be reduced to writing. We think such view is inescapable under this record because Seven Seas specifically stated to the appellees in its letter of July 28th that its instructions were given to it by Foster Wheeler under date of June 18th, which is forty days prior to Seven Seas' letter to appellees. Surely this statement in the letter of July 28th was sufficient to put appellees on notice of the extent of Seven Seas' authority to bind Foster Wheeler. In fact, appellees' letters of June 15th and 17th recognize the extent of the authority of Schurig and Seven Seas. If appellees were unwilling to abide by the instructions contained in the instrument dated June 18th it was their duty to speak and so notify Seven Seas and Foster Wheeler. As we understand appellees' position here it is to the effect that they were not bound by the instructions contained in the instrument dated June 18th and the letter of July 28th because they say that Seven Seas and Schurig orally agreed with them as to the quantity of materials for warehousing and crating and they now seek by parol evidence to contradict, change and add to the contract set out in the letter of July 28th three things: (1) that Seven Seas and Foster Wheeler agreed that appellees would handle the warehousing and crating of materials shipped by Foster Wheeler to Bolivia from Houston except that crated by suppliers; (2) there would

be a minimum of 2,000,000 cubic feet of material for appellees to crate at 50¢ per cubic foot; and (3) Seven Seas had authority, as agent of Foster Wheeler, to change said contract and bind Foster Wheeler thereon by parol agreement. As we understand Flocks' testimony, it is to the effect that detailed information which appellees used in negotiating and formulating their proposals was furnished to them by Schurig because Schurig testified that he consulted with Mr. Barrow, Manager of Foster Wheeler at Houston; that appellees' proposal was based upon information given by Schurig and is set forth in the letters dated June 15 and June 17, 1948. Flocks testified that they went to Barrow's office with Schurig for a general discussion, at which time Flocks said that Barrow confirmed the agreement they had with Schurig, and that they told them they would receive a purchase order representing the contract at a later time. Schurig testified in effect that he took the position that Seven Seas was agent for Foster Wheeler insofar as Western Wood was concerned, based upon his idea that a forwarder is the agent of a principal; that he got all of this information from Salisbury, President of Seven Seas, and he assumed that he had authority from Foster Wheeler; that Barrow, Foster Wheeler's Houston manager, did not confirm that authority but that Barrow looked upon Schurig as agent; and that Barrow did not disaffirm his acts. It appears to us that appellees accepted the written contract for their work and that they operated under it and at no time while they were attempting to work under it did they ever contend or suggest that it was not a full and complete statement of the contract or that every term or provision agreed upon was not set out therein. Going back to the letter of July *28th, the first paragraph in this letter has great bearing on the question before us.* It recognizes that there had been negotiations, both oral and written, but notwithstanding that, the agreement was, "We wish to give you herewith confirmation of the warehousing agreement" as set forth by Foster Wheeler Corporation on June 18th and Change No. 1 under date of July 2nd. If we correctly understand the foregoing paragraph everything that had been agreed upon in that writing was final and conclusive and includes all of the agreements between the parties. In Section III we find the intent expressed in subsections A and B thereof and in C we find this provision: *"The acknowledgment of this purchase order shall be understood by agent to constitute the execution of this instrument as an agreement by and between the agent and contractor subject to the terms and conditions herein."* We think the language aforesaid in the contract in general must be interpreted by the court and not by the jury. It is our view that the foregoing provisions in the instrument of July 28th constitute the only agreement between the parties. The letter of July 28th does not recite, directly or indirectly, that Seven Seas was obligated to furnish appellees, or that appellees had the right, to warehouse, crate and ship a minimum of 2,000,000 cubic feet of materials for Foster Wheeler Corporation, nor does it recite that appellees would have the right to warehouse, crate and ship all of the materials that Foster Wheeler was going to ship from Houston to Bolivia. Our view of the contract is that it was full and complete and included the provisions by which Foster Wheeler was willing to be bound and we further think that every agreement prior to it was merged in it or abandoned by the parties insofar as Foster Wheeler was concerned. Neither the pleadings nor the parol evidence nor the findings of the jury can control this legal conclusion or bind Foster Wheeler beyond the provisions of the letter of July 28th. Here we have an undisputed factual situation where the parties have bound themselves by a writing and their remedies are regulated and determined by it and the law of contract. This is not a suit for common law damages where the rights of the parties depend upon pleadings and evidence without the limitations of the written provisions of the

contract. It was the duty of the court to examine the contract, and not the pleadings of the parties, to determine the rights of the parties. It seems to this court that if, prior to July 28th, there had been an agreement about the quantity of materials to be crated, this quantity would have been inserted in the contract of said date along with the price per cubic foot for its crating. This would have shown the size or volume of material involved and, combined with the price of 50¢ per cubic foot, would have shown appellees the total value involved. It seems to us that that was the natural and the only place where they would expect it to be found. This quantity of material was not something disconnected with the written contract; the quantity of material and the price per cubic foot for the crating are the main and essential elements of the contract from appellees' standpoint. It is not something that the parties would ordinarily leave out of their writings if appellees were to have all or a minimum of 2,000,000 cubic feet for crating, and since they did not so include it the only legal deduction to be drawn is that there was no legal agreement and that such idea was rejected and excluded with the other prior negotiations. It seems to us that under the contract appellees were to crate the quantity sent to them as the contract provides and if they were not willing to do it under the proposed conditions they should have protested at the time the letter of July 28th was received by them. We have previously stated that there is no issue of fraud or mistake pleaded by appellees and we think the evidence tendered is insufficient to tender Issues 2, 3, 3a, 4 and 5, and we are of the further view that the evidence is insufficient to sustain the jury's answers thereto. If we be mistaken in either of these views, then we are of the view that the answers of the jury to the foregoing issues are against the great weight and preponderance of the evidence under the doctrine announced in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

But appellees say in their brief: "With respect to appellants' 'agency' contentions, they apparently are bottomed upon the argument that Seven Seas and Schurig had no 'authority' to enter into any understanding nor agreements not specifically contained within the 'four corners' of the purchase order of July 28, 1948. Not only is it completely undisputed in this record that Seven Seas and its representative, Schurig, had complete authority to negotiate with Western Wood concerning the warehousing and crating of the materials to be shipped to Bolivia through the Port of Houston, but this was with the knowledge, acquiescence and affirmance of Foster Wheeler. As has already been demonstrated in many of the cases heretofore cited, the courts have found no difficulty in upholding the 'authority' of the agent in similar circumstances. Hunter Milling Company v. Satterwhite, supra; East Texas Construction Company v. Reno [Tex. Civ.App., 231 S.W.2d 799], supra. Additional authorities which might be cited to the court are Firestone Tire & Rubber Co. v. Fisk Tire Company, 87 S.W.2d 794 (Tex.Civ.App. Amarillo 1935), approved as to this point, [131 Tex. 158] 113 S.W.2d 175 (Tex.Com.App.1938, opinion adopted), and Rowson v. Fuller, 230 S.W.2d 355, 358, 359, 360 (Tex.Civ.App. Dallas 1950, wr. ref. N.R.E.). In complete candor, counsel for appellees were utterly amazed at appellants' citation of tort liability authorities such as the Trotter case [Trotter v. McLennan County Water Control & Improvement Dist. No. 1, Tex.Civ.App., 252 S.W.2d 734] and the text discussion from Texas Jurisprudence. It is fundamental that vicarious responsibility arising ex delicto is wholly unrelated to the principles of agency authority with respect to contractual dealings. In final analysis, Foster Wheeler would seek to proscribe the authority of Seven Seas and Schurig by the process of legally raising itself by its own bootstraps. Notwithstanding the clear and undisputed testimony in the record concerning the authority of Seven Seas

and Schurig, Foster Wheeler assumes that it would have authorized no person to enter into any negotiations not contained in the incomplete writings upon which it now relies to have integrated all transactions between the parties."

We do not think that appellees' reasoning and authorities as above set out are applicable and controlling as we view this factual situation. There is no doubt that appellees knew that the undertaking of Foster Wheeler was tremendous and that a large amount of tonnage would necessarily be crated in Houston and shipped from the Houston port. It is obvious from this record that appellees were fully acquainted with the magnitude of this operation before they submitted their bid. Appellee Flocks testified to the effect that Schurig advised him that he did not have the exact quantity of material; that they could not determine that but that they were going to put all material that went into the construction of the two refineries and topping plant and all machinery with which to build it and also food for their employees, and that they would have approximately 200 employees sent down from the United States, and would employ 1,500 to 2,000 people locally on the job, and that it would take about 24 to 36 months to complete it, and that they estimated the period of handling it would be about the same, and that while they did not have the exact quantity involved they estimated $3,000,000 in ocean freight for the material they were shipping down, and that "we would work in connection with Foster Wheeler representatives, who would give plans and specifications and approve the ones we submitted to them and would represent Foster Wheeler on the job and that we would operate as the packaging and warehousing agent directly under Foster Wheeler;" that Schurig advised him that they wanted all material packaged in boxes made of two inch lumber and they wanted to use it in their construction down there and that they preferred the bid to show a basis of cubic footage of the completed boxes re-

quired to package the items in. "A. * * * We knew that the rate on that was $36 a ton, meaning that a ton would either weigh 2240 pounds or be 40 cubic feet or less or 40 cubic feet no matter what it weighed under 2240 pounds would constitute a ton, and that is ninety cents a cubic foot and we readily determined it was 3,300,000 cubic feet of material they intended to ship down there. * * * They advised us 70 or 80% would be shipped through Houston. There were certain things they were making in the east such as boilers and heavy construction machinery that it wouldn't be practical to ship from here, but it wouldn't be but about 30% that wouldn't be shipped through the Port of Houston and we would have all that came through the Port of Houston to package and we felt we would have approximately 70% of this 3,300,000 cubic feet. * *." He said that would be about 2,400,000 cubic feet. "Q. * * * We assumed some of that would be sent down unpackaged so consequently we planned on a minimum of 2,000,000 cubic feet to package and crate. * * * Your bid was based on information given to you by Mr. Schurig? A. Yes, sir." That appellees wrote a letter dated June 15, 1948, to H. E. Schurig & Company, Cotton Exchange Building, Houston, Texas, and that this letter was written by his partner, and was written after consultation with Mr. Schurig and in consultation with Mr. Reeves, and we quote the pertinent parts of the letter:

"Dear Mr. Schurig:

"*Relative to the matter of receiving, handling and packaging the oil refinery equipment for the Foster-Wheeler Company, which is to move for export through the Port of Houston, it is our desire to be given every opportunity to submit a definite and final bid on this job.*

"Our purpose of locating a plant in the Houston area was in the first place due to our recognition of the need of this type of plant to assure shippers of all types of

commodities or shipments through the Port of Houston, a properly qualified export packaging service at a fair and equitable price. We are intensely interested in this Port as a growing outlet for manufacturers and exporters. Toward that end we have acquired the necessary facilities for handling all kinds of products currently being packaged here and are prepared for any immediate expansion which may be required for any movement through this Port.

"Our personnel has been built along the same lines, and we have within our organization men with many years of practical experience who are fully capable of handling any requirement in material handling, export packaging, and shipment.

"The company is headed by W. R. Flocks, who, like his father, has been engaged in a life-long manufacture of wooden products. Mr. Flocks, during the war, was the largest producer of pallets and special wooden containers for the service forces, and for his production and service was awarded the Army and Navy 'E' for this company. He served also as Special Consultant to the Navy on material handling.

"Our operation is under the direct management of George H. Bierbaum, who, since his grandfather's time, has been actively engaged continuously in the production management, development and installation of plants and systems of handling within plants, including domestic and export packaging, as consultant for some of the largest manufacturers in this country for 35 years, including export packaging, design and construction for the War Department and other Governmental agencies for several years.

"The supervision of the woodworking plant is in the hands of Herman Bierbaum who has been in plant production for over 30 years.

"Our personnel also includes, from an engineering standpoint, John J. Melton, who, for several years, has had considerable experience in processing and export-packing heavy equipment for the Government and for private concerns: and Sherman O. Oates, a graduate of Purdue University in industrial wood technology and utilization.

"In order to bid on a job of this type, it is necessary to have other information as to weights of individual pieces of equipment, type of packaging desired, as well as minimum and maximum weights and sizes of units to be packaged individually or in groups. There are various methods of determining such bids: namely, cost plus fixed fee, material factors, cubic measure, and percentage of valuation of the equipment packaged (such as adopted by the Government in their processing and disposal of surplus plants and equipment).

"With reference to points of information discussed with you, we submit the following:

"1. Our closed storage space is approximately 14,000 sq. ft. in a fireproof, concrete, brick, glass and steel building, and we have available to us whatever additional space is necessary. Storage rate will run 7¾¢ cwt. per month.

"2. For open storage immediately adjoining the plant, we have approximately 4 acres of level, well-drained area, and also can avail ourselves 2 acres all concrete surfaced area with loading ramp. This entire area is protected by an 8' cyclone fence and watchman service. Open space rate will be approximately 6¢ cwt. per month. For protection in the open we can provide at an equitable charge whatever tarpaulin coverage, paint, grease, or other type of covering is desired.

"3. We own and operate a 1½ ton stake body truck and a GMC heavy duty truck and trailer. We also have regular contract hauling arrangements with an established heavy equipment trucking concern. The plant and the above space is located directly on our spur track serviced by all the railroads entering Houston, through the facilities of the city belt system.

"4. Both the plant and storage facilities are equipped for truck and car level loading.

"5. For outside handling, we have available and regularly use, heavy handling equipment such as cranes, hoists, etc., for all purposes.

"6. For inside handling, our plant is fully equipped with fork lift trucks for handling skidded or palletized loads or single units.

"7. Trucking rates to the dock on ordinary articles run approximately 12½¢ per cwt. Exceedingly heavy or bulky items will be priced on a commensurate basis. Current switching charge on railway cars to the dock is approximately $12 per car.

"8. Our boxing and crating facilities include power driven equipment such as molder, planer, resaw, cutting saws, drill and etc. for all accurate dimensions and patterns required for a complete woodworking and export crating plant. We keep on hand and have readily available at all times, a large supply of lumber and materials. Our facilities include the required equipment and skill for export marking, billing, and preparation of packing lists for any type of shipment, for which we make no extra charge.

"In and out rates will be approximately 2½¢ cwt. each way with two weeks free storage and no in and out charge on material processed by us. We feel that it will be necessary to work out with you, at your convenience, utilizing further information from you, rates on exceedingly heavy or bulky pieces of equipment. These rates will be furnished by a supplemental letter as soon as we can compute them.

"*With the above general information, we hope you will be able to convey to the Foster-Wheeler Company our ability to process this equipment in an efficient and satisfactory manner and our earnest desire to be of service to them.*

"*Any additional information you may desire at this point will be promptly submitted.*"

Flocks further testified in part:

"Q. Now at the time of the letter of June 17th I am about to get into, when it was written, had Mr. Schurig examined your plant at 710 North Drennan Street in Houston? A. Yes, he had.

"Q. Had he seen the outside storage space you had available? A. Yes, sir. Mr. Reeves and I took Mr. Schurig over the plant on the first day we talked to him and showed him the inside and outside space.

"Q. So he could see the nature of the space and ground you had available? A. That's right, and the equipment too.

"Q. Did you take him inside the plant? A. Yes, we took him inside the plant.

"Q. And was he in a position so that he could see such facilities and equipment as you had? A. Yes, as a matter of fact we pointed it out to him and showed it to him.

"Q. All right, between that time and the time this letter of June the 17th was written had Mr. Barrow been out to the plant to see it personally? A. When Mr. Schurig came back to us on June the 17th and told us he wanted to have the bid made on a cubic foot basis he told us he had taken Mr. Barrow out to see the plant and facilities.

"Q. Then Mr. Barrow as well as Mr. Schurig had seen the space and plant available? A. That's right.

"Q. Including the outside as well as the inside equipment? A. That's right.

"Q. Knowing that, did you write another letter? A. Yes.

"Q. To whom was that letter addressed? A. To Mr. H. E. Schurig and Company, attention Mr. H. E. Schurig.

"Q. Who signed that letter? A. I signed the letter."

The letter was tendered in evidence without objection and we quote the pertinent parts of this letter:

"H. E. Schurig & Company
Cotton Exchange Building
Houston, Texas.
"Attention: Mr. H. E. Schurig
"Gentlemen:
"*Supplementing our letter of June 15th regarding Foster-Wheeler export contract, we hereby offer the following services at the prices shown below.*

"1. Inside storage—7¾¢ per cwt. per month

"2. Outside storage—6¢ per cwt. per month

"3. Trucking to dock—12½¢ per cwt. Rail—actual railroad charge.

"4. In charge—2½¢ per cwt. 2 weeks free storage.

"5. Heavy lift—all individual loads of 6000 or more pounds shall have additional charge as follows:
3 tons to 10 tons—$1.00 per ton
10 tons to 20 tons—$2.00 per ton
20 tons to 35 tons—$3.00 per ton
35 tons to 50 tons—$5.00 per ton
50 tons and over—to be negotiated.

"6. Boxing, Strapping and Crating—50¢ per cubic foot, using all 2″ S4S Pine in 14 foot longest lengths. Timber skids of Pipe as required by load for either sling or fork truck handling.

"7. Water or weather proofing for items with movable parts included in cubic charge.

"8. Free in and out and storage on all packaged items (two moves allowed on heavy lift charge).

"9. All labor, direct and indirect and our material furnished in categories not classified above shall be charged at actual cost plus 12%.

"10. Bonded warehouse receipts to be furnished as required.

"11. Marking and paper work without charge.

"12. Insurance of total exposure to be included without charge. Said insurance policy certificate to be furnished to either yourselves or your customer.

"13. Private office facilities including telephone shall be furnished at our plant at 710 North Drennan at no expense, toll calls excepted.

"14. 24 hour watchman service shall be provided at all times.

"15. Terms of payment: All services shall be invoiced monthly and payable net upon invoicing.

"16. Teletype service will be furnished at our main office—306 M & M Building, Houston. Teletype number HO 129.

"*We shall appreciate very much your advising us at your earliest opportunity if our bid is accepted.*" (Italics ours.)

Looking at the foregoing undisputed factual situation in the light most favorable to the appellees, it is obvious that they were of the view that they did not have any contract on June 15, 1948, when Mr. Reeves wrote his letter on behalf of appellees because of the first paragraph and we quote it again:

"*Relative to the matter of receiving, handling and packaging the oil refinery equipment for the Foster Wheeler Company, which is to move for export through the Port of Houston, it is our desire to be given every opportunity to submit a definite and final bid on this job.*" (Italics ours.)

Then follows much general information concerning appellees' facilities and their abilities to do this work and we quote again the last two paragraphs:

"With the above general information, we hope you will be able to convey to the Foster-Wheeler Company our ability to process this equipment in an efficient and satisfactory manner and our earnest desire to be of service to them.

"Any additional information you may desire at this point will be promptly submitted."

■ Needless to say that the letter of June 15th here quoted conclusively shows that on that date there had been no contract between Foster Wheeler and appellees, nor between appellees and Seven Seas, nor between appellees and Schurig. Our views here expressed are further confirmed by appellees' letter of June 17th wherein appellee Flocks supplemented the letter of June 15th, and in the first paragraph of this letter we find, "* * * we hereby offer the following services at the prices shown below," and ended this letter, "We shall appreciate very much your advising us at your earliest opportunity if our bid is accepted." The foregoing constitutes the second written admission on behalf of appellees that they did not have a contract with Foster Wheeler or with Seven Seas or with Schurig and that they were awaiting action and confirmation upon the part of Foster Wheeler. (Italics ours.) This court is of the view that if appellees had intended to base their prices for services on the quantity of material that they were to handle they would have so stated in the letter of June 15th or the letter of June 17th. There is no pleading to the effect that their failure to do so was a mistake or an omission. There is nothing in either of these letters to indicate that the prices submitted by appellees for this work were based on quantity and the letters conclusively show that Foster Wheeler had not become obligated to them in any manner whatsoever at the time these letters were written. The letter of Seven Seas, dated July 28th, was grounded upon authority given to it by Foster Wheeler by instrument dated June 18th and it so stated and there is no evidence in the record to show that Foster Wheeler had any other information or representation from appellees to it after June 17th and prior to the letter of Seven Seas dated July 28, 1948. Each of the letters dated June 15th and June 17th and the letter dated July 28th aforesaid were pleaded and tendered in evidence by appellees without any limitation and are relied upon by them in part for their recovery. In so doing they are bound by the entire contents of such letters. We think the foregoing admissions contained in the letters of June 15th and 17th, written by appellees, under the foregoing undisputed factual situation, bring them within the doctrine announced by this court in J. R. Watkins Co. v. King, 83 S.W.2d 405, 407, no writ history, wherein this court said: "When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him. 17 Tex.Jur. pp. 577, 578, and authorities cited in notes 3 and 4; Mhoon v. Cain, 77 Tex. 316, 318, 14 S.W. 24; Southern Surety Co. v. Inabnit, Tex. Civ.App., 1 S.W.(2d) 412, 415, par. 8; Stephenson v. Barrow, Tex.Com.App., 15 S.W. 2d 575, 576, 577; Nerio v. Christen, Tex. Civ.App., 189 S.W. 1038, 1040 (second column); Smith v. Boston Elevated Ry. Co. [1 Cir.] 184 F. 387, 389, 37 L.R.A., N.S., 429; Broad River Lumber Co. v. Middleby [4 Cir.] 194 F. 817, 821, par. 3; Harlow v. Laclair, 82 N.H. 506, 136 A. 128, 50 A.L.R. 973, 976, 977, and note page 979 et seq." See also City of Waco v. Thralls, Tex.Civ.App., 172 S.W.2d 142 (w. o. m.) and authorities collated in point 8, also Welch Veterinary Supply Co. v. Martin, Tex.Civ.App., 313 S.W.2d 111, at page 119, point 3, n. r. e.

In Milliken v. County of Callahan, 69 Tex. 205, 6 S.W. 681, 684, our Supreme Court made the following pronouncement: "The general rule is that where the written contract is clear and certain, it must be taken to express the will of the parties; and it is not proper to look elsewhere for their intention. * * * All preliminary negotiations, whether written or unwritten, which have led to the execution of the agreement, are deemed to have been absorbed and merged in it, and the writing must be taken as expressing the final views of the parties. * * * It may be read in the light of surrounding circumstances to explain its meaning when obscure or uncertain, but not to contradict the meaning where it is perfectly plain. Contemporaneous writings may be taken into consideration where they are reciprocally dependent, and the meaning of one cannot be brought out without the introduction of the other; but we know of no rule which admits them for the purpose of showing that the parties did not agree upon a stipulation plainly expressed in a writing, which purports to be the final and only contract made between them, unless fraud or mistake in inserting the stipulation has been proved." In Jones v. Risley, 91 Tex. 1, 32 S.W. 1027, 1029, our Supreme Court made this statement of the rule: "Under an absolute rule of law, the wisdom of which has been established by the sanction of ages, the parties are conclusively presumed to have abandoned the verbal agreement at the time they executed the written one." See also Johnson v. Johnson, Tex. Com.App., 14 S.W.2d 805, 806, point 1. We recognize that the foregoing rules are general statements but we believe that they are applicable to the undisputed factual situation here that we have detailed at some length. It follows from what we have said that we are of the view that the evidence tendered is insufficient to tender Issues 2, 3, 3a, 4 and 5, and we are of the further view that the evidence is insufficient to sustain the jury's answers thereto. If we be mistaken in either of these views, then we are of the view that the answers of the jury to the foregoing issues are against the great weight and preponderance of the evidence under the doctrine in In re King's Estate, supra, and that this will require the cause to be reversed and remanded.

We are of the further view that the evidence is insufficient to tender issues Nos. 6, 7, 8, 9, 9a and 10, but if we be mistaken in this view we think the evidence is insufficient to sustain the answers of the jury thereto. If we be mistaken in this view, we think the answers of the jury to each of the foregoing issues is against the great weight and preponderance of the evidence, and under the doctrine announced in In re King's Estate this view requires that the cause must be reversed and remanded. Since this cause is remanded we make no comment upon the evidence tendered relating to the foregoing issues.

With reference to Issues Nos. 11 to 22, inclusive, we are of the view that the evidence is insufficient to sustain the answers of the jury to each of them; but if we be mistaken in this view we are of the further view that the answers of the jury to each of the foregoing issues is against the great weight and preponderance of the evidence under the doctrine announced in In re King's Estate, supra, and that this view will likewise require a reversal of this cause and for that reason we make no further comment upon the evidence tendered relating to the foregoing issues.

We are in accord with the trial court's view in sustaining Schurig's motion for an instructed verdict. We are likewise in accord with the trial court's action in sustaining Seven Seas' motion for judgment non obstante veredicto, and the trial court's action in this behalf will be sustained. The trial court's action in all other respects must be reversed and remanded. Appellants' points insofar as they are in accord with this opinion are sustained; otherwise they are overruled.

Accordingly, the judgment of the trial court is affirmed in part and in part reversed and remanded and all costs of appeal are taxed against appellees. ·

### On Motions for Rehearing

In our original opinion we pointed out that in the petition upon which plaintiffs went to trial they alleged in part:

"That the matters and things discussed and agreed upon by the plaintiffs and H. E. Schurig hereinbefore pleaded and the two letters written by plaintiffs dated June 15, 1948, and June 17, 1948, addressed to H. E. Schurig & Company hereinbefore referred to and the letter of date July 28th, addressed to Western Wood Products Company hereinbefore referred to constituted the contract between the plaintiff and Foster Wheeler Corporation and Seven Seas Mercantile Transport Company, Inc., and H. E. Schurig as agents for Foster Wheeler Corporation and individually."

On page 324 of 53 S.W.2d of the opinion we set out an admission from appellees' brief in which they state: "On June 14, 1948, Mr. Henry E. Schurig approached appellees about the job of crating for export certain refineries for Foster Wheeler. *Mr. Schurig asked that appellees bid on this contract.*"

The record shows that Mr. Flocks, a partner, testified in part, " * * * your bid was based on information given to you by Mr. Schurig? A. Yes, Sir." In our opinion we set out the letters dated June 15th and 17th written respectively by the partners of Western Wood which gave their bid for this work. Nothing is contained in either letter to indicate that the prices submitted by the appellees were based on quantity. Moreover, the letters conclusively show that neither Foster Wheeler, nor Seven Seas, nor Schurig had become obligated in any manner at the time these letters were written. Moreover, the contract evidenced by the letter of July 28, 1948, con-

clusively shows that it was based upon authority given to Seven Seas by Foster Wheeler by an instrument dated June 18, 1948, and it expressly so stated. There is a complete absence of evidence in the record to show that Foster Wheeler had other information or representation from appellees to it after June 17th, and prior to the contract evidenced by the letter of July 28, 1948. All of these writings were introduced in evidence by appellees except the letter dated June 18th, 1948, which was attached to appellants' pleadings and read to the jury, and these letters are relied upon by appellees for recovery. It is obvious that they are bound by the entire contents of these letters. There is an absence of evidence in the record to show that Foster Wheeler had any other information or representation from appellees to it after June 17th, and prior to July 28, 1948. Under the foregoing record it is our view that appellees could not by parole evidence add anything to the contract, could not change it, nor could they contradict it without the written approval of Seven Seas and Foster Wheeler, and no such approval was shown. The additions to the contract, the changes in it, and the contradictions of it contended for by appellees which they sought to establish by parole, if such took place at all, were negotiations between the parties prior to reaching their agreement evidenced by the writing of July 28, 1948, and were either merged in it or rejected and abandoned by the parties. We are of the further view that Schurig was not and could not be created or constituted an agent of Foster Wheeler or Seven Seas with authority to bind either of them by parole agreement different from or contradictory of the written contract between Foster Wheeler and Seven Seas of June 18, 1948, or different from and contradictory of the contract between appellees and Seven Seas of July 28, 1948, since the July 28th contract was based on the letter of June 18, 1948, which was the authority Seven Seas relied upon as to warehousing and crating Foster Wheeler materials. Therefore, as we stated in our

original opinion, special Issues Numbers 2, 3, 3A, 4 and 5, were erroneously submitted to the jury, and the verdict of the jury thereon could form no basis for judgment against appellants for each of the reasons pointed out in our original opinion.

When this cause was originally submitted we gave the parties substantially all the time they requested for oral argument, and, thereafter, we have given much time and thought to this record and to the briefs filed, and the motions and the replies submitted thereto, and after reconsidering the record in its entirety and in view of the contents of the contract shown in the letter of July 28th, and admissions heretofore pointed out, we are of the firm view that our original opinion in this cause is correct, and that it properly disposes of this litigation.

Accordingly, appellees' motions for rehearing are each overruled.